## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

PAMELA D. HARRIS                                                    PLAINTIFF


V.                              NO. 4:08CV00328 JTR


MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                            DEFENDANT


## MEMORANDUM AND ORDER

### I.  Introduction

Plaintiff, Pamela D. Harris, has appealed the final decision of the Commissioner of the Social

Security Administration (the "Commissioner") denying her claim for Disability Insurance Benefits

("DIB").  Both parties have filed Appeal Briefs (docket entries #9 and #11), and the issues are now

joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is

supported by substantial evidence on the record as a whole and whether it is based on legal error.

*Long v. Chater,* 108 F.3d 185, 187 (8th Cir. 1997); *see also* 42 U.S.C. § 405(g).  While "substantial

evidence" is that which a reasonable mind might accept as adequate to support a conclusion,[1]

"substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing

analysis:

> "[O]ur review is more than an examination of the record for the existence of
> substantial evidence in support of the Commissioner's decision; we also take into
> account whatever in the record fairly detracts from that decision."   *Haley v.*

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

> *Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  Reversal is not warranted, however,
> "merely because substantial evidence would have supported an opposite decision."
> *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On July 25, 2005, Plaintiff filed an applications for DIB, alleging disability since August 15, 2003, due to osteoarthritis, depression, carpal tunnel syndrome, and pain.[2]  (Tr. 67-72.)  After Plaintiff's claim was denied at the initial and reconsideration levels, she requested a hearing before an Administrative Law Judge ("ALJ").  On May 9, 2007, the ALJ conducted an administrative hearing, where Plaintiff and a vocational expert ("VE") testified.  (Tr. 349-76.)

At the time of the administrative hearing, Plaintiff was 38-years old, had a high school education, and had attended two years of college. (Tr. 352-53.)  Her past relevant work included a job as a window clerk for the U.S. Postal Service.  (Tr. 353.)

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process.  Step 1 involves a determination of whether the claimant is involved in substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(i) (2005).  If the claimant is, benefits are

---

[2]This is Plaintiff's third DIB application.  Plaintiff filed her first application for DIB on September 17, 2003 (Tr. 58), and her second DIB application on October 5, 2004. (Tr. 65.)

According to the ALJ, Plaintiff's first DIB application was denied on February 9, 2004, and the second DIB application was denied on December 10, 2004.  (Tr. 11.)  The ALJ states that, following these denials, they were "not pursued further."  (Tr. 11.)  The ALJ seemingly implies that these denials were at the administrative "initial" or "reconsideration" levels and were not "pursued further" on appeal to an ALJ.   The ALJ further found that "[t]here is no basis for reopening the [previous] denial determinations; and therefore, the doctrine of *res judicata* applies to the period of time on or before December 10, 2004."  (Tr. 11.)  Thus, for purposes of the DIB application at issue in this case, the ALJ found that "[t]he beginning date under consideration; therefore, is December 11, 2004, the day after the date [Plaintiff] previously was denied benefits."  (Tr. 11.)

Neither party sheds any light on this procedural history.  Importantly, however, Plaintiff *agrees* with the ALJ that, for purposes of this appeal, "[t]he beginning date for the period under consideration . . . is December 11, 2004, the day after the date the claimant previously was denied benefits."  (Docket entry #9, *Pltf's App. Brf.* at 1.)

-2-

denied, regardless of medical condition, age, education, or work experience.  *Id.* at § 416.920(b).

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has an impairment or combination of impairments which significantly limits claimant's ability to perform basic work activities, a "severe" impairment.  *Id.*, § 416.920(a)(4)(ii).  If not, benefits are denied.  *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, § 416.920(a)(4)(iii).[3]  If so, and the duration requirement is met, benefits are awarded.  *Id.*

Step 4 involves a determination of whether the claimant has sufficient RFC, despite the impairment(s), to perform the physical and mental demands of past relevant work.  *Id.*, § 416.920(a)(4)(iv).  If so, benefits are denied.  *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience.  *Id.*, § 416.920(a)(4)(v).  If so, benefits are denied; if not, benefits are awarded.  *Id.*

In his August 1, 2007 decision, the ALJ found that Plaintiff: (1) met the Act's insured status requirements; (2) had not engaged in substantial gainful activity since the alleged onset date; (3) had "severe" impairments consisting of major depression; anxiety disorder NOS with panic attacks; osteoarthritis; and obesity that did not meet a Listing; (4) was not fully credible; (5) had the RFC to perform a wide range of unskilled light work involving lifting no more than 20 pounds; (6) could not return to her past relevant work; but (7) based on VE testimony, could perform other work

---

[3]If the claimant's impairments do not meet or equal a Listing, then the ALJ must determine the claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence.  *Id.*, § 404.1520(e).  This RFC is then used by the ALJ in his analysis at Steps 4 or 5.  *Id.*

existing in substantial numbers in the national economy. (Tr. 19-20.) Thus, the ALJ concluded that Plaintiff was not disabled. (Tr. 21.)

On February 8, 2008, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner. (Tr. 3-5.) Plaintiff then filed her Complaint appealing that decision to this Court. (Docket entry #2.)

## II. Analysis

In Plaintiff's Appeal Brief (docket entry #9), she argues that the ALJ erred: (1) in concluding that she failed to meet a Listing; and (2) in "failing to assess" her nonexertional limitations in evaluating her RFC. For the reasons discussed below, the Court concludes that Plaintiff's arguments are without merit.

## A.    Hearing Testimony and Medical Evidence

Plaintiff testified that, while working as a window clerk for the U.S. Post Office, she was depressed and had problems in her legs, arms, and feet. (Tr. 353.) Plaintiff described anxiety, panic attacks, and depression as her main disabling conditions. (Tr. 355.) Anxiety prevented her from being social with other people and made her withdraw. (Tr. 356.) Plaintiff would have lengthy crying spells and had thoughts of suicide. (Tr. 356.) She was admitted to a mental-health hospital with thoughts of suicide in 2005. (Tr. 357.) According to Plaintiff, her medications did not work. (Tr. 357.) Plaintiff also described having panic attacks. (Tr. 358-59.) Due to stress and anxiety, Plaintiff tried to avoid interaction with people. (Tr. 359.)

According to Plaintiff, she had constant burning pain in her joints, hands, and knees. (Tr. 360.) She also had muscle spasms in her back, and swelling in her feet. (Tr. 360.) Plaintiff sometimes fell when she was working. (Tr. 362.) Plaintiff could sit for an hour and a half, but did

not have strength in her hands to lift things.  (Tr. 363.)

Plaintiff had last seen her psychiatrist in August of 2006, before she was pregnant.  (Tr. 365.) Plaintiff described her medications helping "some."  (Tr. 366.)  Plaintiff's thirteen-year-old daughter and boyfriend performed the household chores.  (Tr. 366.)  Plaintiff essentially stayed in her house and did not get out.  (Tr. 368-69.)

Plaintiff testified that she was successful in obtaining "disability retirement" from the Post Office, and was receiving benefits.  (Tr. 369.)  She stated that she was not receiving regular medical treatment at the time of the hearing. (Tr. 369-70.)

On July 19, 2002, Plaintiff was seen by internal medicine specialist Dr. Muhammed I. Shakir.  (Tr. 207, 222.)  Dr. Shakir completed a Department of Labor "Duty Status Report" form. (Tr. 207-09.)  Dr. Shakir diagnosed Plaintiff with depression and anxiety with "clinical findings" reflecting a "nervous, flat mood."  (Tr. 207.)  Dr. Shakir released Plaintiff from work beginning on July 13, 2002, for four to six weeks.  (Tr. 208.)  In support of this "certification," Dr. Shakir wrote that Plaintiff "is stressed, depressed, has crying spells, needs treatment."  (Tr. 208.)  He referred Plaintiff to see Dr. Duong Nguyen for a psychiatric evaluation.

On August 1, 2002, Dr. Nguyen saw Plaintiff.  (Tr. 241-42.)  Plaintiff reported complaints of increasing depression and anxiety after she moved to a new position at the post office.  (Tr. 241.) She was taking Celexa and Ativan.  (Tr. 241.)  Dr. Nguyen assessed Plaintiff with symptoms of major depression and panic attacks.  (Tr. 242.)  Along the DSV-IV axes, Dr. Nguyen diagnosed: (I) major depression, single episode, moderate; (II) none; (III) obesity[4]; (IV) "problem with primary

_____

[4]At the time of the administrative hearing, Plaintiff testified that she was 5'5" and weighed 204 pounds. (Tr. 352.)

support, occupational" and (V) [GAF] 40.[5]  (Tr. 242.)    He continued Plaintiff's medications and

recommended psychotherapy to address coping with her job.  (Tr. 242.)

On August 25 and 27, 2002, Dr. Shakir assessed Plaintiff with depression and anxiety.  (Tr.

218-19.)  He noted that Plaintiff was "improved" and could return to work without restrictions.  (Tr.

218.)  On November 22, 2002, Dr. Shakir assessed Plaintiff with depression and anxiety.  (Tr. 217.)

On December 27, 2002, Dr. Shakir assessed Plaintiff with anxiety and panic attacks.  (Tr. 216.)

On February 21, 2003, Plaintiff presented to the emergency room complaining of right

knee/ankle pain after a fall.  (Tr. 172.)  An x-ray showed no fracture (Tr. 173), and Dr. Robert

Fleming indicated that Plaintiff "should be able to return to work tomorrow."  (Tr. 170.)

On June 3, 2003, Dr. Shakir assessed Plaintiff with: (1) depression; (2) anxiety; and (3)

insomnia.  (Tr. 215.)  On June 5, 2003, Plaintiff presented to the emergency room following a motor

vehicle accident, complaining of chest pain.  (Tr. 189.)  X-rays of Plaintiff's right hand, chest, right

forearm, right shoulder, and cervical spine were normal.  (Tr. 191-95.)  Plaintiff was assessed with

"muscle strains post motor vehicle collision."  (Tr. 190.)

On June 11, 2003,  Dr. Shakir completed a U.S. Postal Service "Medical/21 Day Clearance

Form."  (Tr. 196.) Dr. Shakir wrote that Plaintiff presented with complaints of "depression, no

appetite, crying spells, inability to sleep."  (Tr. 203.)  Dr. Shakir indicated that Plaintiff's condition

commenced on June 3, 2003, with an unknown duration.  Dr. Shakir released Plaintiff from work

from June 3, 2003 through June 8, 2003.  (Tr. 203.)

---

[5]A GAF of between 31-40 indicates "impairment in reality testing or communication OR [a] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  DSM-IV at 32.  Despite this GAF score, Dr. Nguyen's findings on his mental status exam were normal except for a "decreased activity level" noted under "behavior" and a depressed, frequently tearful mood.  (Tr. 241-42.).

On August 18, 2003, Dr. Shakir filled out a form advising Plaintiff to remain off work until August 25, 2003. (Tr. 212.) Plaintiff complained of pain in her hands, knees, and ankles, and "depression - chronic," "insomnia - initial," "irritability - frequent," and "anxiousness/stress - frequent," and "panic attacks - daily." (Tr. 213.) Dr. Shakir's general examination showed Plaintiff to be obese, and his "neurological system exam" showed "mental status - depressed - crying." (Tr. 214.) Dr. Shakir diagnosed: (1) "panic disorder - status: chronic;" (2) "major depressive disorder, single episode, moderate - status: chronic;" (3) "obesity, morbid - status: chronic;" and (4) "other specified arthropathy (general) - status: chronic." (Tr. 214.)

On August 26, 2003, Dr. Shakir completed a U.S. Postal Service "Medical/21 Day Clearance Form." (Tr. 196.) Dr. Shakir indicated that Plaintiff's "date of injury/illness" was August 18, 2003, and that she had permanent restrictions that would last a "lifetime." (Tr. 196.) In a checklist for restrictions, Dr. Shakir indicated that Plaintiff: (1) could sit intermittently for 5 hours; (2) walk intermittently for 1 hour; (3) could not push, pull, carry, lift, bend, squat, climb, kneel, or twist; (4) could intermittently stand for one hour; and (5) could not perform simple grasping or fine manipulation. (Tr. 197.) Plaintiff's "lifting restriction" was checked as "0-25 lbs." (Tr. 197.) In a box asking "are [Plaintiff's] personal relations affected because of a neuropsychiatric condition? (ability to give & take supervision, meet deadlines, etc.)," Dr. Shakir checked "no." (Tr. 197.) In a box asking whether Plaintiff could "work 8 hours/day?" Dr. Shakir checked "no" and he further noted that Plaintiff had "reached maximum medical improvement." (Tr. 197.)

On August 26, 2003, Dr. Shakir completed a Department of Labor "Certification of Health Care Provider" form. (Tr. 199-201.) In this form, Dr. Shakir indicated that Plaintiff presented with complaints of "crying spells, inability to sleep, irritable, stress." (Tr. 199.) The preceding

"condition" commenced on August 18, 2003, with an "unknown" duration. (Tr. 199.) Dr. Shakir

wrote that Plaintiff should be "released from all duties," with a "probable duration" from August 18,

2003, through August 24, 2003. (Tr. 199.) Dr. Shakir indicated that Plaintiff had been prescribed

medication, and referred to a psychiatrist. (Tr. 200.)

On September 4, 2003, Plaintiff was seen by Dr. Richard Owings for a psychiatric evaluation,

following a referral from Dr. Shakir. (Tr. 239-40.) Plaintiff complained of depression and anxiety.

Dr. Owings assessed Plaintiff with "describ[ing] symptoms of depression." (Tr. 240.) He increased

Plaintiff's prescription of Lexapro and prescribed Klonopin for sleep. Along the DSM-IV axis,

Dr. Owings diagnosed: (I) recurrent major depression; (II) deferred; (III) joint pain; (IV) health

problems, job problems, financial problems; and (V) a GAF of 50.[6] (Tr. 240.)

On September 23, 2003, the U.S. Postal Service wrote Plaintiff informing her that she was

"medically unsuitable" for the job of "Mail Processing Clerk at the Little Rock Processing and

Distribution Center." (Tr. 137.) The Postal Service based its determination on a medical assessment

showing that Plaintiff had the following permanent limitations: (1) a work day lasting no more than

six hours; (2) lifting limited to 25 pounds; (3) walking limited to one hour on an intermittent basis:

and (4) no pushing, pulling, carrying, bending, stooping, squatting, climbing, kneeling, twisting,

simple grasping, or fine manipulation. (Tr. 137.) The Postal Service further informed Plaintiff that

the severity of her restrictions was not compatible with the duties of her job as a Mail Processing

---

[6]A GAF between 41-50 indicates "serious symptoms OR any serious impairment in social, occupational, or school functioning." DSM-IV at 32. The Court notes that, despite this GAF score, the findings of Dr. Owings' "mental status exam" were all normal. (Tr. 239-40.)

Clerk, and that there were no vacant positions available that met her restrictions.[7]  (Tr. 137.)

On September 25, 2003, Plaintiff returned to Dr. Owings for medication management.  (Tr. 238.) Plaintiff reported that her mood was better on her medications.  (Tr. 238.) Although her job situation was not better, Plaintiff believed that she was going to obtain medical disability based on problems with her joints and mood.  (Tr. 238.)  On October 21, 2003, Plaintiff reported to Dr. Owings that her mood and anxiety were good, and that she thought she was going to get retirement or disability from the Post Office.  (Tr. 237.)

On December 17, 2003, Plaintiff returned to Dr. Shakir where he diagnosed: (1) "major depressive order, single episode, moderate — Status: chronic;" (2) unspecified whether generalized or localized, osteoarthritis, other specified sites — Status: chronic;" (3) "Syndrome, carpal tunnel — Status: chronic."  (Tr. 210.)

On February 5, 2004, Plaintiff reported to Dr. Owings that:  she was doing well with her medications; she was gratified that she was about to get retirement from the Post Office; and her stress level was going to go down when she did not have to go to work regularly and be exposed to "the stressful work situation."  (Tr. 236.)  On August 5, 2004, Plaintiff reported to Dr. Owings that she was retired from the Post Office and that she was doing well.  (Tr. 235.)

On December 2, 2004, Plaintiff underwent a consultative general physical examination from Dr. Inge Carter.  (Tr. 226-32.)  Plaintiff demonstrated normal range of motion in her cervical and lumbar spine, and her extremities.  (Tr. 229.)  Plaintiff also had a normal neurological examination,

---

[7]This letter appeared to be a step in Plaintiff's claim for "disability retirement" from the Postal Service. (Tr. 137.) To qualify for federal disability retirement, an individual must be disabled from her current position or any vacant position at the same agency, pay level, and commuting area. *See* 5 U.S.C. § 8337.

and was "fully able" to perform various limb functions.  (Tr. 230.)  Dr. Carter diagnosed Plaintiff

with: (1) crepitus knees; (2) hand pain; and (3) panic attacks.  (Tr. 232.)  According to Dr. Carter,

Plaintiff was "able to see, hear, speak, finger, [and] handle [with] no limitations."  (Tr. 232.)

Plaintiff had "mild limitations" in "lifting, carrying, standing, [and] walking."  (Tr. 232.)

On August 4, 2005, Plaintiff returned to Dr. Owings for medication management.  (Tr. 234.)

She reported that she was not working and collecting disability from the Post Office.  (Tr. 234.)

Dr. Owings' assessment was: "[Plaintiff] is doing well.  Lexapro seems to help, but I suspect a lot

of this has to do with finally getting paid without working and thus she gets what she needs without

being stressed."  (Tr. 234.)

On October 19, 2005, Plaintiff was admitted to The BridgeWay (a private psychiatric

hospital) on complaints of depression and "passive" suicidal thoughts.  (Tr. 339-40.)  Plaintiff

appeared sad with a dysthymic affect.  (Tr. 340.)  Dr. Owings diagnosed: (I) major depressive

disorder, recurrent/moderate; (II) deferred; (III) arthropathy NOS; (IV) problems with primary

support group, social relationship problems, financial problems; and (V) a GAF on admission of 25.[8]

(Tr. 341.)  While in the hospital, Plaintiff participated in group therapy and "talked about her

disappointments in her life, including her job loss, her failure to achieve life goals that she had

imagined for herself and, particularly, romantic disappointments."  (Tr. 337.)  On discharge,

Dr, Owings assessed Plaintiff's GAF to be 50.  Plaintiff was "friendly, well-related and talked in a

hopeful way about her future," and agreed to continue her medications.  (Tr. 337.)

On November 15, 2005, Plaintiff returned to Dr. Owings for medication management.  (Tr.

---

[8]A GAF between 21-30 indicates that "[b]ehavior is considerably influenced by delusions
or hallucinations OR serious impairment in communications or judgment OR inability to function
in all areas."  DSM-IV at 32.

233.)  Plaintiff reported being unhappy with her life and "her old stressors," but that her Effexor was

working well for her.  (Tr. 233.)  On December 16, 2005, Plaintiff returned to Dr. Owings and

reported that she was doing well and that "the medicine is doing what it should in order to keep her

from being depressed."  (Tr. 342.)  Plaintiff related well and was cooperative, and talked positively

about herself and her treatment.  (Tr. 342.)  Dr. Owings encouraged Plaintiff to continue her

medications.  (Tr. 342.)

**B.     Plaintiff's Points For Reversal**

**1.      The ALJ Erred In His Listing Analysis**

In arguing that the ALJ erred in his Listing analysis, Plaintiff does not indicate what specific

Listing she met other than to claim that she "meets the Listings 42:123-42:127."  (Docket entry #9,

*Pltf's App. Brf.* at 12.)  Plaintiff's citation does not correspond to the Social Security regulations, and

the Court can only guess at what this alleged Listing might be.

In substance, Plaintiff seems to suggest that she met some Listing for mental impairments:

"[b]ecause Plaintiff suffers from anxiety, depression, anxiety attacks, panic disorder with

agoraphobia, panic attacks and thought disorder, these interfere with Plaintiff's ability to interact

with others or cope with life on a daily basis, day in and day out. Plaintiff cannot do this with or

without medication."   (Docket entry #9, *Pltf's App. Brf.* at 12.)  Plaintiff also argues that the ALJ

did not properly analyze the "paragraph B" criteria for mental impairments.  (Docket entry #9, *Pltf's*

*App. Brf.* at 6-10.)   The Court assumes that these arguments correspond to her diagnoses of

depression (Listing 12.04 for affective disorders) and anxiety (Listing 12.06 for anxiety disorders).[9]

_____

[9]In assessing Listing 12.04, a claimant must satisfy two of the following "paragraph B"
criteria:
        1. Marked restriction of activities of daily living; or

From his decision, it is clear that the ALJ considered the medical evidence in his analysis of the "paragraph B" criteria for mental impairments and concluded that Plaintiff had: (1) mild limitations in activities of daily living; (2) moderate limitations in social functioning; (3) mild limitations in maintaining concentration, persistence, and pace; and (4) no episodes of extended decompensation. (Tr. 18.)

The medical record establishes that Plaintiff's early depression and anxiety were related to her "stressful" job situation at the Post Office.[10]  By late 2003, when it had become clear that Plaintiff was going to obtain "disability retirement" from the U.S. Postal Service by late 2003, she reported doing well with the medications for her depression and anxiety.   (Tr. 234, 235, 236.) Thereafter, she had only one down turn where she was admitted to a psychiatric hospital in October of 2005.  Upon discharge following mental-health treatment and therapy, Dr. Owings assessed Plaintiff to have a GAF of 50, a score on the border between serious and moderate impairments in social or occupational functioning.  However, in follow ups with Dr. Owings after her discharge, Plaintiff reported doing well again on her medications.  (Tr. 233, 342.)

Plaintiff, who bears the burden of proof at Step 3, must present medical findings that match or equal the criteria specified by a listing.  *See Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).  Plaintiff fails to articulate how the medical findings in this case satisfied her burden.  After

---

2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04(B).  The "paragraph B" criteria for Listing 12.06 are identical.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.06(B).

[10]Importantly, the nonexertional demands of Plaintiff's work at the Post Office were at the semi-skilled level.  (Tr. 373.)

a careful review of the record, the Court concludes that substantial evidence supports the ALJ's

Step 3 decision that Plaintiff's impairments did not meet a Listing.

### 2.    The ALJ Erred In His RFC Assessment

Second, Plaintiff argues that the ALJ erred in assessing her physical and mental RFC.  With

respect to Plaintiff's physical RFC, the ALJ concluded that Plaintiff could perform a wide range of

light work involving lifting no more than 20 pounds.  (Tr. 20.)

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of her

treating physician, Dr. Shakir, who opined that Plaintiff was disabled.  While Dr. Shakir imposed

marked restrictions on Plaintiff, he failed to support *any* of his findings with *any* objective testing

or reasoning.  Furthermore, Dr. Shakir's opinion was in direct conflict with Dr. Carter's opinion

following his examination of Plaintiff.   Importantly, Dr. Carter supported his conclusions with

documented testing.  Under these circumstances, the ALJ properly discounted Dr. Shakir's opinion.[11]

*See Medhaug v. Astrue*, 8th Cir. No. 08-2751 at 13-15 (published slip op. Aug. 26, 2009); *Leckenby*

*v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007).

With respect to Plaintiff's mental RFC, the medical record established that Plaintiff was

doing well with her medications for depression and anxiety.  (Tr. 233, 342.)  Furthermore, the ALJ

accounted for Plaintiff's restrictions from depression and anxiety in precluding her return to past

relevant work (which was semi-skilled), and limiting her to unskilled work of a "simple repetitive

nature," involving "superficial interpersonal contact," where she "would not be dealing directly with

---

[11]While Plaintiff does not specifically argue that the ALJ erred in discounting her credibility, the Court concludes that the ALJ properly evaluated Plaintiff's credibility using the factors identified by the Court in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984). His decision makes it clear that he took into account matters such as her daily activities, medications, and the medical record before deciding that Plaintiff's subjective complaints were not fully credible.

the public." (Tr. 374.)   Under these circumstances, the Court concludes that substantial evidence

supports the ALJ's RFC assessment.[12]

### III.  Conclusion

It is not the task of this Court to review the evidence and make an independent decision.

Neither is it to reverse the decision of the ALJ because there is evidence in the record which

contradicts his findings.  The test is whether there is substantial evidence in the record as a whole

which supports the decision of the ALJ.  *E.g., Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996);

*Pratt v. Sullivan*, 956 F.2d 830, 833 (8th Cir. 1992).  The Court has reviewed the entire record,

including the briefs, the ALJ's decision, and the transcript of the hearing.  The Court concludes that

the record as a whole contains ample evidence that "a reasonable mind might accept as adequate to

support [the] conclusion" of the ALJ in this case.  *Richardson v. Perales*, 402 U.S. at 401; *see also,*

*Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir. 2004).  The Court further concludes that the ALJ's

decision is not based on legal error.

IT IS THEREFORE ORDERED that the final decision of the Commissioner is affirmed and

Plaintiff's Complaint is DISMISSED, WITH PREJUDICE.

DATED this 28th day of August, 2009.

_____
UNITED STATES MAGISTRATE JUDGE

---

[12]Plaintiff concludes her argument by claiming that the ALJ should have sought a further opinion from a treating physician or a consultative examination concerning Plaintiff's mental RFC. While an ALJ has an independent duty to develop the record, Plaintiff has not shown that a crucial issue was left undeveloped by the ALJ.  Moreover, at the conclusion of the administrative hearing, the ALJ asked Plaintiff's counsel whether the case was "ready for submission," to which counsel responded that it was.  (Tr. 375.)